1 **Michael Fuller, OSB No. 09357**
  OlsenDaines
2 US Bancorp Tower
  111 SW 5th Ave., Suite 3150
3 Portland, Oregon 97204
  michael@underdoglawyer.com
4 Direct 503-222-2000

5 **Kim Sordyl, OSB No. 031610**
  Sordyl Law LLC
6 422 NW 13th Ave # 751
  Portland, Oregon 97209
7 Kim@kimsordyl.com
  503-502-1974
8

9 **Emily Templeton**
  Law Clerk
10 OlsenDaines

11

   Attorneys for Plaintiff
12

13

14

15
              **IN THE CIRCUIT COURT OF THE STATE OF OREGON**
16
                   **FOR THE COUNTY OF MARION**
17

18  **NATHAN MONSON**, an individual,        Case No.: 22CV12785

19                  Plaintiff,

20           v.                             **COMPLAINT**

21
    **STATE OF OREGON,** through the        **WHISTLEBLOWER RETALIATION**
22  **LEGISLATIVE CONDUCT**                 (ORS 659A.199 and 659A.203)
    **COMMITTEE, ADMINISTRATIVE**           **FIRST AMENDMENT VIOLATIONS**
23  **COMMITTEE, and COUNSEL**              (42 U.S.C. § 1983)
    **COMMITTEE; TINA KOTEK, PETER**
24  **COURTNEY, FLOYD PROZANSKI,**          Prayer: $1,200,000
    **CHUCK THOMSEN, JULIE FAHEY,**
25  **RON NOBLE, JESSICA KNIELING,**        Fee Authority: ORS 21.160(1)(d)
    **DEXTER JOHNSON and VAL HOYLE**
26  individually,

Page 1- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1     Defendants.    **NOT SUBJECT TO MANDATORYARBITRATION**

2     Jury Trial Requested

3

4

5                    **NATURE OF THE CASE**

6                              1.

7           This is an action based on retaliation after plaintiff reported the legislature's violations

8     of discrimination laws and an inter-governmental conciliation agreement requiring the

9     investigation and correction of unlawful discrimination reported at the State's Capitol.  Plaintiff

10    was terminated and retaliated against in violation of Oregon's whistleblower statutes in

11    substantial part because he reported and opposed the legislature's abdication of its legal and

12    binding contractual obligations to individuals working at the capitol subjected to sexual

13    harassment and gender discrimination.

14

15                              2.

16          This is also an action under 42 U.S.C. § 1983 for deprivation of plaintiff's rights,

17    privileges or immunities secured by the Constitution and laws under color of state law.

18    Plaintiff, a public sector employee, reported unlawful conduct, malfeasance, mismanagement,

19    and abuses of power at the Oregon State Capitol.  Plaintiff's speech constituted a matter of

20    public concern protected by the First Amendment to the United States Constitution. Defendants

21    participated in and ratified unlawful action against plaintiff for protected speech and in the

22    retaliatory termination of plaintiff.

23                              3.

24          This is also an action to vindicate Plaintiff's rights and the rights of other employees to

25    work in an environment free from discrimination and retaliation for exercising rights under

26

Page 2- **COMPLAINT**                                    **SORDYL LAW, LLC**
                                                         422 NW 13th Ave. #751
                                                         Portland, OR 97209
                                                         503-502-1974

1  Oregon's whistleblower statutes and the First Amendment. For this reason, Plaintiff also seeks

2  injunctive relief.

3                              **JURISDICTION AND VENUE**

4                                          4.

5         This court has jurisdiction over the parties, who at all material times were residents

6  and/or conducting regular, sustained business activity within the County of Marion, in the state

7  of Oregon.  Venue is proper in the Circuit Court for the County of Marion, pursuant to ORS

8  14.080, as Defendants maintained their principal place of business in Marion County, and the

9  civil rights violations alleged herein were committed in the County of Marion.

10

11                            **PROCEDURAL REQUIREMENTS**

12

13        On December 4, 2021, Plaintiff Nathan Monson provided a timely written notification

14 ("Tort Claim Notice") to legislative defendants, and on January 19, 2022 to Val Hoyle

15 regarding the existence of his claims as required by ORS 30.275.

16                                          5.

17        On January 10, 2022, Plaintiff timely filed charges, against the defendants, of unlawful

18 employment practices with the Oregon Bureau of Labor and Industries ("BOLI"), Civil Rights

19 Division.  Four months have passed and BOLI has not even communicated whether an

20 investigator has been assigned to the complaint.

21                                          6.

22 Thus, the complaint has been timely filed in regards to all included state law claims.

23                                    **PARTIES**

24                                          7.

25

26

Page 3- **COMPLAINT**                                        **SORDYL LAW, LLC**
                                                             422 NW 13th Ave. #751
                                                             Portland, OR 97209
                                                             503-502-1974

1   Plaintiff, **NATHAN MONSON** is former Oregon Legislature employee, worked as the

2   Legislative Equity Officer ("LEO") from April 12, 2021 until June 15, 2021 when he was

3   forced to resign.

4   8.

5   Defendants the **STATE OF OREGON, LEGISLATIVE ASSEMBLY,**

6   **LEGISLATIVE ADMINISTRATION COMMITTEE, JOINT CONDUCT COMMITTEE**

7   and **LEGISLATIVE COUNSEL COMMITTEE** operate the Oregon State Capitol

8   ("Capitol").   The Legislative Administration Committee provides administrative services to the

9   Legislative Assembly, its support staff, and the public.  The Joint Conduct Committee governs

10  the Legislative Equity Office.  The Legislative Counsel Committee governs legal counsel.

11  9.

12  Defendants Senators **FLOYD PROZANSKI, CHUCK THOMSEN**, and

13  Representatives **JULIE FAHEY** and **RON NOBLE** are individuals who, at all relevant times,

14  served as Co-Chairs of the Joint Conduct Committee.

15  10.

16  Defendant Senate President **PETER COURTNEY** is an individual, who at all relevant

17  times, served as Co-Chair of both the Legislative Counsel Committee and the Legislative

18  Administrative Committee (LAC).

19  11.

20  Defendant House Speaker **TINA KOTEK** is an individual who, at all relevant times,

21  served as Co-Chair of the Legislative Counsel Committee and Legislative Administrative

22  Committee.

23  12.

24  Defendant **JESSICA KNIELING** is an individual, who at all relevant times, served as

25  the Employee Services Manager or HR Director for the Government defendants.

26  13.

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1     Defendant **DEXTER JOHNSON** is an individual, who at all relevant times, served as

2    Legislative Counsel for the Government defendants at the pleasure of the Legislative Counsel

3    Committee.

4               14.

5     Defendant **VAL HOYLE** is an individual, who at all relevant times, served as the

6    Commissioner of the Bureau of Labor and Industries subsequent to Brad Avakian.

7              **FACTUAL BACKGROUND**

8               15.

9     For years preceding plaintiff's employment, the Legislature has engaged in, and

10    endorsed, sexual misconduct and discrimination against subordinate and/or female employees.

11    After numerous incidents were reported, the Bureau of Labor and Industries ("BOLI"), through

12    then Commissioner Brad Avakian opened an investigation into sexual harassment,

13    discrimination and retaliation in the Oregon Legislature.

14               16.

15     BOLI's January 3, 2019 Substantial Evidence Determination ("SED") spanned 52

16    pages, detailing civil rights violations, and laid blame with Senate President Peter Courtney and

17    House Speaker Tina Kotek, Legislative Counsel Dexter Johnson, and Employee Services

18    employees.

19               17.

20     On March 5, 2019, Courtney, Kotek, and new BOLI Commissioner Val Hoyle signed a

21    Conciliation Agreement.  They promised, among other things:

22        • $1.3 million payment to the victims,

23        • Establish a staffed Equity Office overseen by a new bi-partisan Joint Conduct

24           Committee,

25        • Adopt definitive investigative timelines,

26

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

- Offices of Legislative Counsel and Legislative Administration shall have no role in handling discrimination complaints and investigations.

18.

The legislative history shows that the Equity Office was inspired, at least in part, by past mishandling of sexual harassment complaints by Dexter Johnson, the Employee Services department, Courtney, and Kotek.

19.

Oversight of the Equity Office was placed with the Joint Conduct Committee ("the Committee") co-chaired by Senator Floyd Prozanski, Senator Chuck Thomsen, Representative Julie Fahey, and Representative Ron Noble.

20.

 In November 2019, interim Legislative Equity Officer (LEO) Jackie Sandmeyer started temporarily running the office. Sandmeyer was running her own outside consulting firm at the same time.

21.

It took over two years for the Legislature to hire a permanent LEO.   Nate Monson was recruited from Iowa after a five- month, open and competitive hiring process.



22.

In April 2021, Mr. Monson started training with Sandmeyer.  He was shocked to learn:

a.  There was no Equity Office.  There were no employees, no files (electronic or paper), no complaints, no process, no evidence, no records; not even office supplies. Sandmeyer's laptop had nothing on it.

b.  There were over 30 voicemails on the LEO office phone. Sandmeyer told Mr. Monson to "just delete them."

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

c.  In seeming violation of Rule 27, the Committee had not provided oversight of the LEO, or established a "uniform recordkeeping process," as required by the Conciliation Agreement. Sandmeyer handed Monson a post-it note list of the ongoing complaints, including one filed by Sen. Kayse Jama's former Chief of Staff, who is transgender, against Employee Services Manager Jessica Knieling for alleged transphobic conduct.  Knieling refused training on transgender issues, and Sen. Jama's Chief of Staff resigned.  Sen. Jama replaced them with a cisgender man.

d.  In violation of the Conciliation Agreement, there was no data collection.

e.  In seeming violation of the Conciliation Agreement, there was no "continued effort by legislative leadership to improve the Capitol culture."

f.  In seeming violation of Legislative rules, exit interviews were not being conducted.

g.  Outside investigators were not being paid and had stopped work.

h.  Outside investigators had caps on their contracts and had stopped work.

i.  Sandmeyer had not followed Rule 27 processes.

j.  Sandmeyer told a female complainant they had been working on her complaint when in reality nothing had been done in the months since it had been filed.

k.  Legislators and staff had been seemingly violating the Conciliation Agreement by:

1)  allowing Johnson and Knieling, who were banned from involvement, to continue to work on investigations and complaints, and advise on Rule 27 process;

2)  Johnson and Knieling were part of the work group that revised Rule 27[1];

---

[1] *See* BOLI Conciliation Agreement at 7 (http:// opb-imgserve-production.s3-website-us-west-2.amazonaws.com/original/boli_-_legislature_settlement_3-5-

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

3)  failing to adopt definitive investigation timelines; and

4)  failing to conduct harassment trainings.

l.  Despite Johnson and HR's past failures and express exclusion from the investigation process and complaints, Johnson and Knieling regularly injected themselves, both officially and unofficially.

m.  Despite Johnson's misconduct delineated in the BOLI SED, Kotek and Courtney kept him on as Legislative Counsel, the highest legal position in the legislature. This signaled to victims that Dexter's behavior was acceptable and rewarded.

n.  While contributing to the chaos, and meddling in matters from which he was legally barred, Johnson told Monson, in the presence of others, "You have the worst job in Oregon."

o.  Sandmeyer had failed to conduct any follow up on complaints that were several months old including a hostile work environment complaint against Sen. James Manning and various complaints against Sen. Peter Courtney.

p.  Sandmeyer falsely claimed 30 Democrat lawmakers decided not to proceed with the complaint against Rep. Mike Nearman. This delayed the investigation.

q.  Knieling regularly called complainants "crazy," and once used a complainant's mental health condition to criticize her behind the scenes, calling her "crazy" to Mr. Monson.  This employee has an ongoing discrimination lawsuit naming the Committee co-chairs Sen. Prozanski and Sen. Thomsen for discrimination and aiding and abetting.

---

2019_1551828369254.pdf) (Dexter Johnson is the Legislative Counsel, and HR is overseen by the Legislative Administration Committee. The two were to play "no role" in investigations, with "all complaints" handled by the Equity Office).

Page 8- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

r.  According to Knieling and Rep. Fahey, Sandmeyer had a relationship with a Kotek staffer, but she was not demoted or terminated.  In contrast, the BOLI SED found Senate President Peter Courtney instructed his female staff member to resign, be fired, or be demoted because he did not approve of her being in a romantic relationship with a legislator.

s.  Sandmeyer said "Kotek thinks she is a tough lesbian but really she will try to bribe you to keep you quiet…She'll offer you whatever you want - money, resources for the office."

t.  Two female employees repeatedly complained of a sexually hostile work environment in the Revenue Office led by Legislative Revenue Officer Chris Allanach. Knieling, who was banned from handling complaints, took the complaints but did not act on them.

u.  The Committee pre-decided complaints before they held hearings.

v.  Employee Services and Legislative Administration leaders regularly mock the Diversity Equity Committee.

w.  Knieling said she withheld funding from the Diversity Equity Committee because it was a "waste of time."

x.  Sandmeyer said multiple sexual harassment complaints had been lodged against Representative Rob Nosse, but Sandmeyer had not acted on them.

y.  Sandmeyer said Representative Dan Bonham filed a complaint against Rep. Kotek for telling him to "get the fuck out of my office." Sandmeyer did not take action on the complaint.

23.

On Mr. Monson's first day of work, Sandmeyer told him that Knieling is "crazy, evil, controlling and transphobic."  Despite her role and position, Sandmeyer did not investigate complaints against Knieling. On Mr. Monson's third day, Knieling told him that she cries most

Page 9- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1   nights because Sandmeyer bullies her. Legislative Administrator Brett Hanes told Monson that

2   Sandmeyer lied on her resume, lied about being in the office, and lied about paying bills.

3                                          24.

4       Knieling also repeatedly told Monson that Sandmeyer:

5       • Lied about her experience on her resume,

6       • Lied to the Committee during hearings,

7       • Worked for her private business on taxpayer time and Knileing had evidence to

8           prove it.

9       Knieling did not report these accusations to the Committee.

10                                         25.

11      During his first week on the job, Mr. Monson reported a lack of documentation to DOJ

12  attorney Marc Abrams and Knieling even though the BOLI SED faulted Respondents for this

13  this practice.

14      "Respondents consciously relied on processes that kept reports of harassment

15      undocumented … which resulted in ineffective or non-responses and discouraged

16      people from bringing forward complaints."[2]

17                                         26.

18      Mr. Monson also reported mishandling of public funds and contracts, unpaid bills, caps

19  on legal contracts, and lack of follow-up on complaints, in violation of legislative branch

20  procedural rules, which have the force and effect of law. Abrams, who had just wrapped up

21  defending similar claims against the state and Johnson, said "We're fucked."   Knieling said that

22  she was not surprised, stating "I told you this place was crazy," and "Just fix it."

23                                         27.

24

25  _____

[2] BOLI SED p. 50. *See* http://opb-imgserve-production.s3-website-us-west-
26  2.amazonaws.com/original/sed_-_issued_for_stemsh180801-11138_1546549497381.pdf.

Page 10- **COMPLAINT**                              **SORDYL LAW, LLC**
                                                    422 NW 13th Ave. #751
                                                    Portland, OR 97209
                                                    503-502-1974

1      Knieling also instructed Mr. Monson not to look into the BOLI information surrounding

2  dysfunction in the recent past, once informing him that the related BOLI complaints were

3  merely "political," not to be taken seriously.  When Sandmeyer resigned, they signed a form

4  indicating all documents had been turned over.  To this, Abrams replied via e-mail, "Well Mrs.

5  Lincoln, how was the rest of the play?"

6                                          28.

7      Mr. Monson then reported to the Committee co-chairs Sen. Floyd Prozanski, Sen. Chuck

8  Thomsen, Rep. Julie Fahey, and Rep. Ron Noble that complaints were languishing, and

9  processes were not being followed. His complaints included that invoices were being ignored

10  and investigators were illegally hired, without following appropriate process.

11                                         29.

12      Monson's complaints of illegal practices were met with disinterest and passed off as

13  simple administrative oversights.  The Committee refused to provide Monson with independent

14  counsel for legal questions.  Instead, they told him to "ask Dexter [Johnson]" for legal advice

15  relating to Rule 27 and "ask Jessica Knieling" regarding Rule 27 complaint procedures, despite

16  that both were banned from involvement. The co-chairs also dismissed the BOLI Conciliation

17  Agreement as "politically motivated," and kept Johnson heavily involved in Rule 27 complaints

18  even though Johnson was not employed as an employment attorney.

19

20                                         30.

21      After Monson's reports to the co-chairs, he experienced retaliation.  Monson was now

22  being intentionally ignored, his concerns were now being intentionally dismissed, and

23  communications to him were now being chilled.

24                                         31.

25      Mr. Monson also complained, mostly through Knieling, to Senate President Peter

26  Courtney and House Speaker Tina Kotek's offices about mismanagement, the lack of an Equity

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1   Office, and inaction on complaints.  According to Knieling, Sen. Courtney's Chief of Staff

2   Anna Braun's response was, "Sandmeyer was a great political choice and now that we have

3   Nate we can just clean up all of this quietly." For her part, Rep. Kotek called Mr. Monson and

4   told him that she knew there were many problems in the Equity Office, and kept saying

5   "whatever you do, just fix it."  Everyone was aware of past press and lawsuits exposing Capitol

6   mismanagement, but that more effort was placed on protecting reputations than combating a

7   hostile and retaliatory work environment.

8                       32.

9       At one point Monson was admonished by Knieling for reporting the problems to Kotek

10  and Courtney's offices.  "Mind your own business," she warned, including "You're going to get

11  in trouble for breaking the chain of command," and "All communication of LEO problems to

12  Kotek and Courtney's offices goes through me."   It was clear that the BOLI Conciliation

13  Agreement was not being enforced.

14                      33.

15      For example, Mr. Monson told Knieling details about the multiple sexual harassment

16  complaints that Sandmeyer claimed had been made against Rep. Rob Nosse that had not been

17  investigated.  In addition to a complaint of sexual harassment by Nosse's former Chief of Staff

18  who resigned over it, Sandmeyer said complaints had also been made that Rep. Nosse:

19

20          • threatened to expose that his staffers had been dancers at STAG nightclub;

21          • had sexual harassment complaints filed against him by former employees that

22             were never investigated;

23          • one alleged victim went on workers' compensation to avoid Rep. Nosse and get

24             treatment for damages caused by the harassment.

25                      34.

26

Page 12- **COMPLAINT**

1    Knieling brushed it off, admitting her knowledge of the complaints while stating that she

2    had already talked extensively to one of the complainants, without following the prescribed

3    process.  That complainant eventually resigned.

4                                            35.

5    Mr. Monson also found a printed email from a DAS employee to Sen. Boquist

6    complaining about Knieling. This was in addition to the complaint that Knieling was

7    transphobic.  Mr. Monson asked Knieling about both. She promptly changed the subject.

8                                            36.

9    Mr. Monson repeated his objections and questioning about misconduct, despite

10   Knieling's warnings.  Tension escalated when Monson asked Knieling, in response to

11   complaints that had been made against Knieling, to get training on transgender issues.  She

12   refused, and the complainant eventually resigned.

13                                           37.

14   Monson also found a printed email from a DAS employee to Sen. Brian Boquist

15   complaining about Knieling, including that Knieling was engaging in retaliation. Monson

16   confronted Knieling regarding the allegations, after which Knieling began efforts to drive him

17   from his position.

18

19                                           38.

20   Although Monson had been hired months earlier, and no complaint had been filed,

21   Knieling started an investigation into Mr. Monson's background. While later claiming that

22   someone inspired her inquiry by randomly contacting her from another state about his

23   background, Knieling carefully checked Monson's past references and work history looking for

24   discrepancies.

25                                           39.

26

Page 13- **COMPLAINT**                                              **SORDYL LAW, LLC**
                                                                    422 NW 13th Ave. #751
                                                                    Portland, OR 97209
                                                                    503-502-1974

1    It is easy to infer a retaliatory intent in Knieling's actions when looking at the contrast

2  between her extreme response to Monson's alleged resume discrepancies but she did nothing

3  but gossip about Sandmeyer's alleged resume discrepancies.  Although Knieling said she had

4  evidence proving that Sandmeyer was improperly getting paid, she never reported it.

5                                        40.

6    Knieling's dismissive attitude in the face of serious concerns regarding Sandmeyer's

7  mishandling of complaints further indicates retaliatory motives in her disparate treatment of

8  Monson.[3]

9                                        41.

10    Knieling never consulted Monson for his reasonable response to what amounted to

11  sordid gossip, and never allowed him to explain events and dispel her assumptions. Rather,

12  Knieling drafted a memo dated June 8, 2021, to the Committee co-chairs attacking Monson.

13                                        42.

14    On June 9, 2021, without without giving any reason, the Committee co-chairs and

15  Knieling called Monson to a meeting.  Mr. Monson was unaware that Knieling had written a

16  memo the day prior attacking his integrity.  The Committee co-chairs ambushed Monson with a

17  barrage of questions about his background.   Mr. Monson responded to all the questions and

18  offered evidence and factual support.

19                                        43.

20    Rep. Julie Fahey dismissed Mr. Monson's attempts to explain, and was not receptive to

21  reviewing any evidence.  She pressed Monson to resign.  Fahey explained that just as

22

23    [3] Furthermore, Sandmeyer, who did not complain of illegal conduct, and did not investigate complaints
against Knieling, was not held accountable for serious misconduct. Knieling told Monson that Sandmeyer would
24  go months without signing into their computer or email, because they were running an outside business while
working for the State. Knieling also said she investigated, and found that Sandmeyer was often absent because they
25  were working on their outside business. Further, Knieling said Sandmeyer never recorded those absences and got
paid for them. This appeared to anger Knieling, but she took no action. Instead, she insisted that Monson talk to the
Committee to let them know Sandmeyer "was nuts." Knieling did not distribute her investigation or personnel
26  information on Sandmeyer to the Capitol or the media.

Page 14- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1   Sandmeyer's career could not recover from a relationship with a staffer in Rep. Kotek's office,

2   Monson would not be able to recover from Knieling's allegations of resume discrepancies.

3   Rep. Fahey reminded him that she had told him early on that the LEO position was a bad job

4   and the place is "crazy."

5                                                      44.

6          Monson returned to his office and gathered the requested information for the

7   Committee, but Knieling entered and informed him that he was not going to survive, and the

8   decision to terminate him would happen within days. Knieling instructed him that he was not to

9   provide any facts or evidence to the Committee – that it must only go through her, denying him

10  basic process. She then dismissed Monson's factual support with a conclusory and nonsensical

11  determination that it served as "context not proof." She also told him this is a "life lesson."

12  Monson never heard from the Committee again.  Knieling added, "If you resign, you are only to

13  put me down as a reference, and I will say you resigned in lieu of termination because you lied

14  on your resume."

15                                                   45.

16         Knieling then instructed Monson  to draft a memo detailing the state of the Legislative

17  Equity Office, along with his resignation letter.

18                                                   46.

19         On June 15, 2021 Monson drafted a memo and resignation letter to the Committee co-

20  chairs detailing unlawful conduct, taxpayer waste and mismanagement.  The documents were

21  public records.[4]

22

23         [4] Stating in part: "The Legislative Equity Office as it stands is essentially non-existent.
    When I started, there were no case files, electronic documents, trainings scheduled, and bills
24  that were unpaid resulting in investigations lasting on average 10 months over this past year.
    There were outstanding cases where individuals tried to file but heard nothing back. The
25  severity of the situation means that justice is not being given to those who have come forward
    and may cost taxpayers millions in lawsuits from the liability of not having proper procedures,
26  documentation, and oversight."  This letter was followed up with a complaint memo.

Page 15- **COMPLAINT**                                    **SORDYL LAW, LLC**
                                                          422 NW 13th Ave. #751
                                                          Portland, OR 97209
                                                          503-502-1974

47.

Weeks later, Mr. Monson contacted a journalist, in part because a Capitol employee had impressed upon him the LEO's duty to protect new employees, interns and those fresh out of college.  Monson confirmed his complaint and cooperated, in the interest of the public and the Capitol employees.  He detailed his concerns about mismanagement and misconduct.  He also described how that behavior negatively impacted Rule 27 complainants, respondents, and the Capitol generally.

48.

On July 8, 2021, OPB published a story on Monson's concerns.  Monson's cooperation with the press and his underlying complaint both constitute protected free speech, vital to political accountability and transparency.

49.

In response to Mr. Monson's protected free speech, one week later, on July 15, 2021, the Committee distributed to all capitol employees and to the press, an email attacking Mr. Monson's character.  The email contained Mr. Monson's personnel documents, typically exempt from disclosure under public records laws.  The Committee also provided extraneous gossip obtained during Knieling's so-called "investigation" – even when the media had not requested it.

50.

Rather than following Oregon law, Capitol protocol and process, Knieling offered Monson a post-decision "name clearing" hearing regarding his personnel records that the Committee released to the Capitol and media.  A public employer is not entitled to attack an employee who reports wrongdoing with poorly researched and unsubstantiated allegations and then absolve itself by offering a "name clearing" hearing, but that is exactly what the Committee did.  Personnel matters are presumed confidential, and the threat of public exposure looms over every reporting party in the Oregon Capitol. Knieling's post hoc impression of one

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1    of Monson's references, for example, is not important to the public's interest. The documents

2    contained unsubstantiated and false information that was harmful to Monson's career.

51.

4    The Committee retaliated further against Mr. Monson by sending Knieling's memo

5    detailing negative statements about Mr. Monson to the employees throughout the capitol, and to

6    the media, implying that Mr. Monson lied.

52.

8    A member of the Committee told the media that Mr. Monson resigned, not because of

9    the illegal behavior and retaliation, but because he knew he would have been fired as a result of

10   Knieling's detective work.  This was also false.

53.

12   Mr. Monson was treated in the same manner as previous whistleblowers who were

13   threatened with public exposure and ruined careers, as found by BOLI's 2019 SED:

14   "Respondents are aware of the inherent chilling effect created by the

15   power imbalances between legislators and those whose careers can be

16   significantly hindered by Respondents.  Respondents have compounded that

17   chilling effect in multiple ways * * * A culture where a victim is unable to prove

18   what happened to them can reasonably be in fear of being called a liar, or be

19   sanctioned, is an optimal environment for harassment…"

54.

21   As an additional act of retaliation, Knieling then refused to provide Mr. Monson with his

22   final paycheck, in violation of Oregon law.  Mr. Monson filed a BOLI complaint simply to be

23   paid, receiving his final check only after formally complaining to the BOLI wage and hour

24   division.

55.

Page 17- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

On July 21, 2021, Sen. Boquist sent an e-mail to the Committee calling out the illegal retaliation and its chilling effect. Sen. Boquist's correspondence expressly reported that:

"The release to legislative employees and worldwide news media violates LBPR 27, Oregon Revises Statutes, the Government Employee Rights Act, and BOLI Settlement Agreement."

Despite the personnel rules, and state and federal legal standards, no investigation ensued, and Sen. Boquist was largely ignored.

56.

"Without an LEO in place, the office is not functioning as intended," the Committee co-chair Sen. Floyd Prozanski said. "We are currently in the process of hiring a new LEO." Despite having knowledge of the problems for months, the Committee wrote in its July 15, 2021 email sent Capitol-wide. "We are taking the time now to gather all the relevant facts to ascertain the veracity of the allegations ..."

57.

There is no evidence that the Committee followed through with any inquiry. It has been almost 3 years since the BOLI Conciliation Agreement was signed. Yet, the Legislative Equity Office remains vacant and complaints are not being investigated.

**FIRST CLAIM FOR RELIEF**

**RETALIATION FOR GOOD FAITH REPORT OF VIOLATION OF LAW – ORS 659A.199**

**AGAINST DEFENDANTS KNIELING, PROZANSKI, THOMSEN, FAHEY & NOBLE**

58.

Plaintiff incorporates by references the allegations in paragraphs 1 through 58.

59.

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1    Mr. Monson in good faith reported information that he believes is evidence of a

2    violation of a state or federal law, rule or regulation.

3                                          60.

4    Defendants Knieling, Prozanski, Thomsen, Fahey and Noble discriminated against

5    Monson in the terms, conditions and privileges of employment due to his protected activity of

6    reporting, and opposition, to activities he believed in good faith were violations of laws, rules

7    and regulations having the force of law.

8                                          61.

9    The acts that give rise to plaintiff's claims herein were committed by defendants

10   individually and collectively, acting in the course and scope of their duties on the public body's

11   behalf and violated plaintiff's rights under ORS 659A.199.

12                                         62.

13   Plaintiff's protected activity was a substantial and motivating factor for the retaliatory

14   actions, which included ignoring him, responding with chilled communications, dismissing his

15   complaints, denying him opportunities to speak to Courtney or Kotek, conducting an

16   investigation into his background, denying him process, demanding that he tender a resignation,

17   and defaming his character.

18                                         63.

19   As a result of defendant's unlawful conduct as alleged herein, Monson has suffered

20   emotional distress, humiliation, loss of self- esteem, anxiety, impaired reputation, and mental

21   anguish and is entitled to an award of compensatory damages in an amount to be determined at

22   trial pursuant to ORS 659A.885(3).

23                                         64.

24   As a result of the unlawful actions alleged herein, plaintiff has and will continue to

25   suffer economic damages.  Mr. Monson is entitled to recover from defendants such lost wages

26

Page 19- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1 and benefits of employment and other economic losses in such amount as may be established at

2 trial pursuant to ORS 659A.885(3).

3                65.

4       Mr. Monson is entitled to reinstatement to his former position or another suitable and

5 available position and if reinstatement is not feasible, he should recover an appropriate amount

6 in lost future wages and lost earning capacity in an amount to be determined at trial.

7                66.

8       Mr. Monson is entitled to a declaration that defendants acted in violation of the statutes

9 set forth in this complaint for relief and equitable relief enjoining defendants from future

10 violations of the statutes set forth herein, and such other relief in favor of Mr. Monson on such

11 terms as the court may direct.

12                67.

13       Mr. Monson is entitled to recover his reasonable attorney's fees, reasonable expert

14 witness fees, and other costs of the action to be paid by defendants pursuant to ORS 659A.885,

15 ORS 20.107.

16 **SECOND CLAIM FOR RELIEF**

17 **(ORS 659A.203 – RETALIATION BY A PUBLIC EMPLOYER)**

18                68.

19       Plaintiff incorporates by references the allegations in paragraphs 1 through 68.

20                69.

21       Plaintiff reasonably believed that the Legislature's practices in addressing complaints of

22 sexual harassment, abuse and gender discrimination constituted violations of federal, state or

23 local law, rule or regulation as well as mismanagement by his employer.

24 **COUNT ONE – AGAINST JESSICA KNIELING**

25                70.

26

Page 20- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1    Plaintiff reported to Jessica Knieling and DOJ attorney Marc Abrams that there was a

2  lack of necessary documentation with respect to complaints of harassment, which resulted in

3  ineffective or lack of response and discouraged people from bringing forward complaints.  He

4  further reported unpaid bills, caps on legal contracts, and lack of follow-up on complaints, in

5  violation of legislative branch procedural rules, which have the force and effect of law.

6                                    71.

7    Jessica Knieling prevented, discouraged, dissuaded, and/or interfered with plaintiff's

8  right to make such disclosures in violation of ORS 659A.203(1) (a, b, d) and disciplined Mr.

9  Monson in violation of 659A.203(2) as follows:

10  a)  When she learned that Mr. Monson had reported to Senate President Peter

11      Courtney and House Speaker Tina Kotek's offices about mismanagement, the

12      lack of an Equity Office and inaction on complaints, Knieling admonished Mr.

13      Monson for reporting the problems to Kotek and Courtney's offices, warning

14      him to "Mind your own business."  She also told him he was going to get in

15      trouble for breaking the chain of command, and "all communications of LEO

16      problems to Kotek and Courtney's offices goes through me."

17  b)  Knieling instructed Mr. Monson not to look into the BOLI information, once

18      informing him that the past BOLI complaints were merely "political," not to be

19      taken seriously.

20  c)  In response to Mr. Monson's continued reports of unlawful conduct and

21      mismanagement, including a complaint made against Knieling herself, she

22      engaged in unlawful retaliation by initiating a personnel investigation into Mr.

23      Monson's background with the goal of finding discrepancies as pretext to justify

24      his termination of employment;

25  d)  In furtherance of her retaliatory goal of terminating his employment, Knieling

26      prepared a memo attacking Mr. Monson;

Page 21- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

e) Knieling further retaliated against Mr. Monson by ignoring legislative process, instructing him to prepare a letter of resignation.

f) As an additional act of retaliation, Knieling then refused to provide Mr. Monson with his final paycheck.

**COUNT TWO – AGAINST CO-CHAIRS OF JOINT CONDUCT COMMITTEE**

**Sens. Floyd Prozanski, Chuck Thomsen, Reps. Julie Fahey, and Ron Noble**

72.

Plaintiff reported legal violations and mismanagement to the Joint Conduct Committee Co-chairs.

73.

The Joint Conduct Committee Co-chairs prevented, discouraged, dissuaded, and interfered with plaintiff's right to make such disclosures in violation of ORS 659A.203(1) (a, b, d) and disciplined Mr. Monson in violation of 659A.203(2) as follows by:

a) ignoring him, dismissing his concerns, and by chilled communications, in violation of ORS 659A.203(1)(d);

b) Rep. Fahey reminded him that she told him early on that the LEO position was a bad job and the place is "crazy."

c) After reminding Mr. Monson what she had stated earlier, the place is "crazy", Rep. Fahey told Mr. Monson to resign.

d) In response to Mr. Monson's complaints, the Committee distributed to all capitol employees and to the press, Mr. Monson's personnel file information, typically exempt from disclosure under public records laws.  The Committee also provided extraneous gossip obtained during Knieling's so-called "investigation" – even when the media had not requested it.

Page 22- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

e) The Committee retaliated further against Mr. Monson by sending Knieling's memo detailing negative statements about Mr. Monson to the employees throughout the capitol— and to the media — implying that Mr. Monson lied.

f) A member of the Committee falsely told the media that Mr. Monson resigned, not because of the illegal behavior and retaliation, but because he knew he would be fired over Knieling's detective work.

## THIRD CLAIM FOR RELIEF

### ORS 659A.030(1)(G) – AIDING AND ABETTING

### AGAINST DEFENDANTS JOHNSON, COURTNEY, KOTEK AND HOYLE

74.

Defendants Johnson, Courtney, Kotek and Hoyle were directly involved in the Conciliation Agreement entered into with BOLI in 2019.

75.

As the highest- ranking officials in the Legislative Assembly and Co-chairs of the Legislative Counsel's Office (Courtney and Kotek), defendants Johnson, Courtney and Kotek are charged with ensuring that complaints of sexual harassment and gender discrimination are appropriately documented, independently investigated, promptly remedied, free from any retaliation to the complainant.

76.

Defendants Johnson, Courtney and Kotek have failed in that responsibility, and instead aided and abetted the acts of retaliation by Knieling and the Co-Chairs of the Conduct Committee by:

a) Failing to enforce the terms of the Conciliation Agreement, instead permitting the Joint Conduct Committee members and Human Resource representative to

Page 23- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

EXHIBIT 1, Page 23 of 28

1    engage in conduct that dissuaded and discouraged the reporting of unlawful

2    conduct;

3    b)  Failing to adequately monitor the activities of the Legislative Equity Office;

4    c)  Failing to adequately monitor the activities of the Legislative Conduct

5    Committee;

6    d)  Failing to provide the Legislative Equity Office leadership with appropriate tools

7    such as independent legal counsel as required under the Conciliation Agreement;

8    e)  Failing to effectively respond to Mr. Monson's complaints directed to Peter

9    Courtney and Tina Kotek's offices about mismanagement, the lack of an Equity

10   Office and inaction on complaints.

11   f)  Failing to communicate with Mr. Monson directly, instead requiring that all

12   communications be through Knieling, in violation of ORS 659A.203(d).

13                                         77.

14   Through abdication of their responsibilities, defendants Johnson, Courtney and Kotek

15   aided Knieling and the Co-chairs of the Joint Conduct Committee members to engage in the

16   unlawful acts of retaliation under ORS 659A.199 and ORS 659A.203.

17                            **FOURTH CLAIM FOR RELIEF**

18   **42 U.S.C. § 1983 – FIRST AMENDMENT VIOLATION AGAINST KNIELING AND JOINT CONDUCT**

19                                    **COMMITTEE**

20                                         78.

21   Plaintiff incorporates by references the allegations in paragraphs 1 through ____.

22                                         79.

23   Mr. Monson's communications about the Legislative Equity Office were on a matter of

24   public concern.

25                                         80.

26

Page 24- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

EXHIBIT 1, Page 24 of 28

1    Mr. Monson expressed his concerns in his capacity as a private citizen and not as part of

2    his official duties because:

3    a) Mr. Monson was prohibited from performing his duties as the Legislative Equity

4       Officer;

5    b) Mr. Monson's reports were made outside his "chain of command" according to

6       defendant Knieling;

7    c) Mr. Monson reported his concerns about the Legislative Equity Office with the media

8       after his employment was terminated; and/or

9    d) The scope of Mr. Monson's communications entailed broad concerns over systemic

10      abuse and corruption beyond the Legislative Equity Office, and which included

11      employees' civil rights throughout the Capitol.

12                                         81.

13    Defendant Knieling and the Co-chairs of the Joint Conduct Committee engaged in

14   adverse employment actions including forcing Mr. Monson's resignation and disparaging his

15   reputation internally and to the public through the media.

16                                         82.

17    Mr. Monson's speech was a substantial or motivating factor for the adverse actions by

18   defendants.

19                                         83.

20    At the time that defendants engaged in adverse actions, Mr. Monson's right to engage in

21   free speech was a right clearly established under the First Amendment and was sufficiently

22   definite that any reasonable official in the defendants' shoes would have understood that their

23   adverse acts violated plaintiff's rights under the Constitution.

24

25                          **FIFTH CLAIM FOR RELIEF**

26                 **(WRONGFUL DISCHARGE AGAINST ALL DEFENDANTS)**

Page 25- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

84.

Plaintiff incorporates by references the allegations in paragraphs 1 through ___.

85.

Oregon has a public policy prohibiting the State Legislature from discriminating or otherwise retaliating against employees because they report conduct that violates an inter-governmental agreement designed to remedy past and prevent future acts sex discrimination at the State Capitol.

86.

Defendants terminated Mr. Monson's employment in violation of Oregon's public policies.

87.

Defendant retaliated against Mr. Monson in substantial part because he reported conduct which he reasonably believed violated the rights of capitol interns and employees to seek prompt remedial action in response to complaints of sexual harassment, abuse or gender discrimination.

88.

As a direct and proximate consequence of defendants' unlawful discriminatory conduct, Mr. Monson has suffered economic damages including but not limited to loss of wages and loss of benefits including medical and retirement benefits. Mr. Monson is entitled to an award of lost wages and benefits, plus prejudgment interest.

89.

As a direct and proximate consequence of defendant's unlawful discriminatory conduct, Mr. Monson has and continues to suffer non-economic damages including, but not limited to, emotional distress, humiliation, loss of self-esteem, and feelings of retaliation.

90.

Page 26- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

As a direct and proximate consequence of defendants' unlawful discriminatory conduct, Mr. Monson is entitled to equitable relief, including the expungement of any negative references in his personnel file, any working file, or other actors' file.

91.

Mr. Monson is entitled to attorneys' fees and costs, including expert witness fees, pursuant to ORS 20.107.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the court to:

1. Declare defendant in violation of the statutes and cause of action set forth in each of plaintiff's claims for relief;

2. Grant a permanent injunction enjoining defendants, and all persons in active concert or participation with defendant, from discriminating against employees who invoke the protections of the Whistleblower statutes;

3. Order defendants to make plaintiff whole by providing compensation for non-economic losses;

4. Order defendants to make plaintiff whole by compensating him for his past and future economic damages;

5. Order defendants to compensate plaintiff for his costs of suit and reasonable attorney fees, costs, and expert witness fees;

6. Order defendants to pay prejudgment interest and post-judgment interest on all amounts due to Mr. Monson as a result of this action, with interest at the prevailing rate; and

7. Grant plaintiff a prevailing party fee pursuant to ORS 20.190.

8. Order such further or alternative relief in favor of Mr. Monson as the court deems appropriate.

9. Plaintiff intends to Amend this Complaint to add a claim for punitive damages.

## JURY TRIAL DEMAND

Page 27- **COMPLAINT**

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974

1    Plaintiff demands a jury trial on all questions of fact or combined questions of law and

2 fact raised by this complaint.

3    DATED:  __April 18, 2022_____

4

5

6                                    Sordyl Law, LLC

     By:   _____
7           Of Attorney for Plaintiff and Trial Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**SORDYL LAW, LLC**
422 NW 13th Ave. #751
Portland, OR 97209
503-502-1974