IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NATHAN MONSON, | Civ. No. 6:22-cv-00604-AA |
| Plaintiff, | **OPINION & ORDER** |
| v. | |
| STATE OF OREGON; FLOYD PROZANSKI; CHUCK THOMSEN; JULIE FAHEY; RON NOBLE; JESSICA KNIELING, | |
| Defendants. | |

AIKEN, District Judge.

This case comes before the Court on Defendants' Motion for Summary Judgment, ECF No. 23. The Court will retain supplemental jurisdiction over this matter and, for the reasons set forth below, the motion is GRANTED.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury

could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

In March 2019, the Oregon Legislature entered into a Conciliation Agreement before the Commissioner of the Bureau of Labor and Industries. Monson Decl. Ex. A. ECF No. 32. Under the Conciliation Agreement, the Oregon Legislature agreed to establish a staffed Equity Office with oversight by a new bipartisan joint conduct committee. *Id.* at 4. "Upon its establishment, all complaints and corresponding investigations related to discrimination or sexual harassment will be handled by the Equity Office." *Id.* at 6-7.

The Oregon Legislature's joint conduct committee has four co-chairs, all of whom have been named as Defendants in this action: Senator Floyd Prozanski,

Senator Chuck Thomsen, Representative Ron Noble, and Representative Julie Fahey (collectively, the "Co-Chairs"). Abrams Decl. Ex. A, at 16. ECF No. 24.

Defendant Jessica Knieling is the interim Human Resources Director for the Oregon Legislature. Kneiling Decl. ¶ 1. ECF No. 25.

In November 2020, Plaintiff Nathan Monson submitted a resume to the Oregon Legislature as part of his application for the position of Legislative Equity Officer ("LEO"). Abrams Decl. Ex. A, at 2-3, 5. Plaintiff's resume represented that he was employed by the Iowa Coalition for Collective Change ("ICCC") as that organization's Director for LGBT Equality and that he had held the position since October 2020. *Id.* at 50. At his deposition, Plaintiff admitted that he had never been employed by ICCC. *Id.* at 3-4. Plaintiff's resume also showed that he had been employed by Iowa Safe Schools as the Executive Director from May 2007 to November 2020. *Id.* at 50. Plaintiff testified that he had been terminated from his employment at Iowa Safe Schools at the beginning of November 2020 and that he was no longer employed by Iowa Safe Schools at the time he submitted his application to the Oregon Legislature. *Id.* at 5.

Following a series of interviews, Plaintiff was offered the position of LEO on March 9, 2021. Monson Decl. ¶ 2. Plaintiff began work on April 12, 2021. *Id.* at ¶ 4. Plaintiff understood that the Oregon Legislature's conduct committee could appoint an acting LEO, but that a permanent LEO would require a vote of the full legislature. Abrams Decl. Ex. A, at 6; Knieling Decl. ¶ 2.

Prior to Plaintiff being hired as LEO, Jackie Sandmeyer was the acting or interim LEO. Abrams Decl. Ex. A, at 7. After starting work as LEO, Plaintiff discovered that significant aspects of the Equity Office's work had been neglected under Sandmeyer. Monson Decl. ¶ 4. Plaintiff asserts that he made repeated reports to the Co-Chairs and Knieling about dysfunction and mismanagement of the Equity Office under Sandmeyer. *Id.* at ¶ 6. Plaintiff asserts that he was discouraged from making a complete report concerning the state of the Equity Office by Knieling. *Id.* at ¶ 6(d).

During the "last two weeks of [Plaintiff's] employment," Plaintiff "reported Sandmeyer's unlawful practices to Employee Services in a conversation [he] had with Knieling and to the Co-Chairs by speaking with Representative Fahey." Monson Decl. ¶ 7.

On June 8, 2021, Knieling was contacted by Luella Nelson Brown, the Executive Director of ICCC. Knieling Decl. ¶ 3. Brown "made clear that [Plaintiff] had never held *any* position with ICCC." *Id.* Following that call, Knieling made further inquiries and discovered additional inaccuracies in Plaintiff's resume. *Id.* Knieling prepared a memorandum describing inaccuracies and false statements in Plaintiff's resume and application for employment (the "Knieling Memo"). Abrams Decl. Ex. A, at 52-55.

On June 9, 2021, Plaintiff attended a meeting with Knieling and the Co-Chairs at which Plaintiff was told that "Luana Nelson-Brown of the Iowa Coalition for Collective Change ("ICCC") had contacted the Legislature and said there was a

discrepancy in [his] employment history." Monson Decl. ¶ 8. Plaintiff asserts that Representative Fahey "demanded [Plaintiff] resign immediately." *Id.* Plaintiff "mentioned the status of the Equity Office in an attempt to ensure the Co-Chairs were aware of the unlawful practices [he] had uncovered and could thus take steps to remedy the issues even if they proceeded with their plan to summarily terminate me." *Id.*

"The Co-Chairs were concerned because the LEO position requires the highest level of integrity" and Knieling "was told to convey to [Plaintiff] that the Co-Chairs would be scheduling a public hearing to consider his employment." Knieling Decl. ¶ 4. Knieling did so on June 11, 2021. Monson Decl. ¶ 10. Plaintiff "was given the option of resigning rather than being involuntarily being removed from government service." Knieling Decl. ¶ 4. Plaintiff was "told to prepare for the Co-Chairs a list of issues that remained to be dealt with." *Id.* Plaintiff, in turn, expressed additional concerns to Knieling about the state of the Equity Office, particularly under Sandmeyer's term as the LEO, and "to further ensure the issues would not go neglected after my impending termination." Monson Decl. ¶ 10.

Monson resigned as LEO on June 15, 2021. Monson Decl. ¶ 11. Monson had served as LEO for approximately two months. At the time of his resignation, Monson prepared a memorandum outlining "serious issues pertaining to the Legislature's handling of harassment complaints," entitled "State of the Legislative Equity Office." (the "Monson Memo"). Monson Decl. ¶ 11; Knieling Decl. ¶ 4.[1]

---

[1] As noted, the Knieling Declaration affirms that Plaintiff was ordered to prepare the Monson Memo. Knieling Decl. ¶ 4. In his deposition, Monson testified that he was ordered to prepare the Monson

On June 29, 2021, Knieling received a public records request "for all materials relating to Monson's resignation" from journalist Dick Hughes. Knieling Decl. ¶ 5.

On June 30, 2021, Plaintiff reached out to journalist Dirk VanderHart of Oregon Public Broadcasting ("OPB") and asked to speak with VanderHart the following day. Abrams Decl. Ex. A, at 62. Plaintiff had "multiple conversations" with VanderHart, about Plaintiff's brief tenure as LEO. Monson Decl. ¶ 12. Plaintiff "provided VanderHart with details of [Plaintiff's] complaints about the Equity Office and the Legislature's handling of harassment complaints." *Id*.

On July 8, 2021, OPB published an about the Equity Office entitled "In blistering exit, former Capitol official lays out major concerns with how Oregon handles harassment," in which Plaintiff's concerns were discussed. Monson Decl. ¶ 13; Abrams Decl. Ex. A, at 63. The contents of the Monson Memo were also discussed in the article and Monson was quoted at length. Abrams Decl. Ex. A, at 63-70.

On July 12, 2021, VanderHart contacted Knieling to ask for "materials relating to [Plaintiff]'s resume." Knieling Decl. ¶ 7.

Also on July 12, 2021, Knieling was contacted by the Co-Chairs, who requested a meeting to discuss the release of the Knieling Memo in response to the public records requests and "[t]he work that is being done to determine which of [Plaintiff]'s allegations about the function of the [Equity] office are true . . . and the work that still needs to be done on this front[.]" Knieling Decl. Ex. D, at 1.

---

Memo. Abrams Decl. Ex. A, at 38-39. In his own Declaration, however, Plaintiff asserts that the "Co-Chairs did not request or direct that I prepare this memorandum." Monson Decl. ¶ 11. The Court concludes that this contradiction is not material for purposes of this motion, however.

On July 14, 2021, Knieling corresponded with the Co-Chairs about offering Plaintiff the opportunity for a name-clearing hearing and about the release of the Knieling Memo to journalists under the public records requests. Knieling Decl. Ex. E. Knieling also provided the Co-Chairs with a copy of a letter to be circulated to legislative employees explaining the situation and providing them with copies of the Knieling Memo. *Id.* at ¶ 8; Ex. E, at 4.

On July 17, 2021, OPB and VanderHart published an article about Plaintiff's resignation entitled "Oregon legislative official's resume was under scrutiny prior to his explosive resignation." Monson Decl. Ex. C. The contents of the Knieling Memo were discussed at length in the article. *Id.* Plaintiff asserts that he has suffered emotional distress as a result of the release of the Knieling Memo. Monson Decl. ¶ 15.

## DISCUSSION

In the operative Second Amended Complaint ("SAC"), ECF No. 21, Plaintiff alleges a single claim for post-discharge discrimination under ORS 659A.030(1)(f). SAC ¶ 7. That statute provides that it is an unlawful employment practice:

> For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so.

ORS 659A.030(1)(f).

To establish a prima facie claim under ORS 659A.030(1)(f), a plaintiff must show that (1) they engaged in a protected activity; (2) they were subject to adverse action; and (4) the adverse action was taken against them because of their protected

activity. *Meyer v. State by and through Oregon Lottery*, 292 Or. App. 647, 678 (2018). Here, Defendants dispute all three elements.

Additionally, Defendants suggest that the Court should decline to continue to exercise supplemental jurisdiction over this case as Plaintiff has dropped his federal claims and the only remaining claim arises under Oregon state law. Under 28 U.S.C. § 1367(a), district courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Court may decline the exercise of supplemental jurisdiction if, *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In assessing whether it should retain supplemental jurisdiction, courts are directed to focus on whether the consequences "of either retaining or declining to retain supplemental jurisdiction in a given case will promote the values of economy, convenience, fairness, and comity." *Arroyo v. Rosas*, 19 F.4th 1202, 1216 n.8 (9th Cir. 2021) (internal quotation marks and citation omitted). Here, the parties have completed discovery and fully briefed a motion for summary judgment on the sole remaining claim. It would not promote the values of economy, convenience, fairness, or comity to return the case to the Oregon state court at this stage. The Court will therefore retain supplemental jurisdiction to resolve the pending motion.

I.  **Protected Activity**

Defendants assert that Plaintiff did not engage in a protected activity for purposes of a retaliation claim. Defendants contend that the "protected activity" alleged in the case does not include any reports Plaintiff made while employed as the LEO and only encompasses Plaintiff's post-termination discussions with OPB and that, because those conversations were "off the record," they were not intended for dissemination and so cannot be considered protected whistleblowing.

However, the SAC alleges that "[f]rom April of 2021 to June of 2021, plaintiff engaged in protected activity and reported *to the State of Oregon* information in good faith that he believed was evidence of a violation of a state or federal law, rule or regulation, including abuses of power, mismanagement, sexual harassment, gender discrimination, discrimination in a place of public accommodation, gross waste and other misconduct." SAC ¶ 5 (emphasis added). On its face, Plaintiff's claim concerns reports made by Plaintiff during the period when he was employed as the LEO and alleges that the reports were made "to the State of Oregon," rather than to outside journalists and media entities. Although this is a post-employment retaliation claim, the SAC alleges that *the retaliation* occurred post-employment, rather than the protected activity. *See* SAC ¶¶ 6-7 (alleging that Defendants "discriminated against plaintiff post-discharge,").

The protected activity alleged in the SAC is, therefore, the reports Plaintiff made to Knieling and the Co-Chairs concerning dysfunction and mismanagement in

the Equity Office.[2] Plaintiff testified in his deposition that he conveyed his concerns about the state of the Equity Office to Knieling and the Co-Chairs during Plaintiff's brief tenure as LEO. Abrams Decl. Ea. A, at 27-29. Plaintiff makes a similar assertion in his Declaration. Monson Decl. ¶¶ 6, 8, 10.

Plaintiff also drafted the Monson Memo concerning the state of the Equity Office, although Plaintiff testified in his deposition that he was ordered to prepared the Monson Memo. Abrams Decl. Ex. A, at 38-39. The Monson Memo was also turned over contemporaneously with Plaintiff's discharge as LEO. *Id.* at 40. Defendants point out that, other than the Monson Memo, Plaintiff did not make any reports about the Equity Office in writing and this is confirmed by Plaintiff's deposition testimony, *Id.* at 39, but there is no requirement that whistleblower reports be in writing.

The Court concludes that there is a question of fact as to whether Plaintiff engaged in a protected activity.

## II. Adverse Action

An adverse action is an act that reasonably would deter an employee from engaging in the protected activity. *Summerfield v. Oregon Liquor Control Commission*, 366 Or. 763, 780-81 (2020).

---

[2] The record before the Court indicates that Plaintiff contacted Dirk VanderHart of OPB on the evening of June 30, 2021, asking for a "completely off record conversation maybe tomorrow." Abrams Decl. Ex. A, at 62. VanderHart replied that he would contact Plaintiff the following day to "find a time to talk." *Id*. This suggests that Plaintiff made his disclosures to VanderHart no earlier than July 1, 2021, which would place the conversation outside of the "April of 2021 to June of 2021" period in which Plaintiff alleges that he engaged the protected activity. SAC ¶ 5. While both Plaintiff and Defendants appear to accept that Plaintiff's discussions with VanderHart were part of the protected activity giving rise to Plaintiff's claim for retaliation, that assumption is contrary both to the period in which the protected activity is alleged to have occurred and to the allegation that Plaintiff made his protected disclosures to "the State of Oregon." *Id.*

Here, the allegations of adverse action concern the release of the Knieling Memo. Defendants contend that the Knieling Memo was not released *sua sponte*, but was instead made available in response to public records requests. Plaintiff argues that the release of the Kneiling Memo by Defendants constitutes an adverse action because (1) it was not actually requested by any journalists and (2) it was released without Plaintiff being provided notice as required by statute.

ORS 192.314 establishes that "[e]very person has a right to inspect any public record of a public body in this state, except as otherwise expressly provided by ORS 192.338, 192.345 and 192.355." ORS 192.314(1)[3]. Oregon law provides that "disclosure is the rule" and "[e]xemptions from disclosure are to be narrowly construed." *Brown v. Guard Publishing Co.*, 267 Or. App. 552, 563 (2014) (internal quotation marks and citation omitted).

There are statutory limitations on liability for public bodies for the release of public records. ORS 192.335 provides that:

> A public body that, acting in good faith, discloses a public record in response to a request for public records is not liable for any loss or damages based on the disclosure unless the disclosure unless the disclosure is affirmatively prohibited by state or federal law or by a court order applicable to the public body. Nothing in this subsection shall be interpreted to create liability on the part of a public body, or create a

---

[3] ORS 192.314(2) provides that if "a person who is a party to a civil judicial proceeding, to which a public body is a party, or who has filed a notice under ORS 30.275(5)(a), asks to inspect or to receive a copy of a public record that the person knows relates to the proceeding or notice, the person must submit the request in writing to the custodian and, at the same time, to the attorney for the public body." Plaintiff asserts that the public records requests at issue here were improper because they were not submitted to the custodian and attorney. Pl. Resp. 24-25. ECF No. 31. This argument is at odds with the plain language of ORS 192.314(2), which requires notice to the custodian and attorney if the person requesting public records is a party to a civil judicial proceeding or has filed notice indicating an intention to commence such a suit. None of the journalists involved fall within that category and so ORS 192.314(2) plainly does not apply to their requests.

Page 11 –OPINION & ORDER

cause of action against a public body, based on the disclosure of a public record.

ORS 192.335(1).

Of note, there is no evidence of bad faith on the part of Defendants in the release of the Knieling Memo.

### A. Public Records Requests

Plaintiff contends that none of the requests for information made by journalists can be read as encompassing the Knieling Memo and that Defendants' release of the Knieling Memo in response to the requests was purely retaliatory.

On June 29, 2021, journalist Dick Hughes sent a public record request addressed to Knieling on behalf of Oregon Capital Insider. Knieling Decl. Ex. B, at 2. As Plaintiff is challenging whether the request actually sought the Knieling Memo, the text of the request is worth examining in full:

> This is a public records request for information regarding Mr. Nate Monson's departure.
>
> I am seeking a) Any letter of resignation, email or similar item that he wrote regarding his departure; b) any memo, report or letter he wrote with recommendations about the role and/or operations of the Equity Office; and c), if they can be released, any directive, memo or letter from you or others to Mr. Monson regarding his credentials or work, including anything advising him of his status and/or giving him the option of resigning in lieu of termination.
>
> Given the public interest in the work of the Equity Office, I ask that any fees be waived.
>
> If you have any questions, or if I should phrase my request differently, let me know. If this request should be directed to someone else, please do so or let me know whom to contact.

Knieling Decl. Ex. B, at 2.

To find that this request did not encompass the Knieling Memo would require an unreasonably narrow reading of the request. The Court concludes that there was a public records request from a journalist seeking the Knieling Memo.

### B. Failure to Provide Notice

Next, Plaintiff asserts that, accepting that a valid request was made, Defendants were required by statute to give Plaintiff notice of the request and a copy of what was to be released. In support of this, Plaintiff points to ORS 192.363(3), which concerns requests for personal information:

> Upon receiving a request described in subsection (1) of this section, a public body shall forward a copy of the request and any materials submitted with the request to the individuals whose personal information is being sought or to any representatives of each class of persons whose personal information is subject to the request.

ORS 192.363(3).

In relevant part, ORS 192.363(1) applies for requests for disclosure of records described in ORS 192.355(3). ORS 192.355(3), in turn, exempts from disclosure:

> Upon compliance with ORS 192.363, public body employee or volunteer residential addresses, residential telephone numbers, personal cellular telephone numbers, personal electronic mail addresses, driver license numbers, employer-issued identification card numbers, emergency contact information, Social Security numbers, dates of birth and other telephone numbers contained in records maintained by the public body that is the employer or recipient of volunteer services.

ORS 192.355(3).

The Knieling Memo does not fall into any of the categories described by ORS 192.355(3) and so the notice requirements of ORS 192.363(3) would not have been triggered by the requests for the Knieling Memo. Plaintiff's Response asserts that he

Page 13 – OPINION & ORDER

was entitled to notice under ORS 192.355(2)(a). Pl. Resp. 28-29.[4] However, as discussed, the notice requirement of ORS 192.363(3) applies to the specific categories of information under ORS 192.355(3). The Court therefore concludes that the failure to give Plaintiff notice of the request was not an adverse action, as there was no requirement that he be given notice under that statute.

The Court concludes that because the release of the Knieling Memo was required by Oregon public records law following a public records request, and because Plaintiff was not entitled to notice of the release, there was no adverse action and it is unnecessary for the Court to reach the question of causation. Defendants are entitled to summary judgment and the motion is GRANTED.

## CONCLUSION

For the reasons set forth above, the Court will retain supplemental jurisdiction over this case. Defendants' Motion for Summary Judgment, ECF No. 23, is GRANTED. This case is DISMISSED and final judgment shall be entered accordingly.

It is so ORDERED and DATED this ___11th___ day of March 2024.

                                      /s/Ann Aiken
                                      ANN AIKEN
                                      United States District Judge

---

[4] Of note, Plaintiff does not argue that the Knieling Memo was categorically exempt from disclosure under ORS 192.355(a)(2), but only that Plaintiff was entitled to notice of the request.